CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
November 13, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:26-cr-00021 |
| Rahiem Nathaniel Monroe, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

This matter is before the court on Defendant Rahiem Nathaniel Monroe's Motion to Revoke Detention Order. (Dkt. 35.) Pursuant to 18 U.S.C. § 3145(b), Monroe asks this court to revoke United States Magistrate Judge Joel. C. Hoppe's order of detention entered on October 8, 2026. (Dkt. 16.) After a *de novo* review of the record and the parties' arguments, the court concludes that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community if Monroe were released pending trial. Accordingly, the court will deny Monroe's motion.

## I. Background

### A. Procedural History

On September 29, 2026, the government filed a criminal complaint against Monroe, alleging that he possessed a firearm that had been shipped and transported in interstate commerce, after previously having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Dkt. 3; Dkt. 3-1 at 2.) After the Magistrate Judge issued an arrest warrant, (Dkt. 4), Monroe was arrested on October 8, 2026, (Dkt. 25). At the initial appearance later that

day, the parties presented arguments as to the issue of detention pending trial. (Hr'g Tr. 9:20–49:22 (Dkt. 35-2).) The Magistrate Judge heard testimony from Monroe's mother, Yolanda Monroe, who is willing to serve as a third-party custodian during the pretrial period. (*Id.* 15:8–33:8.) After considering the detention factors set forth in 18 U.S.C. § 3142(g), including Monroe's community and family ties, criminal history, the nature of the offense, and the weight of the evidence against him, the Magistrate Judge concluded that there were no condition or combination of conditions the court could impose that would reasonably assure Monroe would not be a danger to the community if he were released pending trial. (*Id.* 44:3–49:17.) Accordingly, the Magistrate Judge granted the government's oral motion for detention. (Dkts. 14, 15.)

On October 21, 2026, Monroe moved to revoke the detention order pursuant to 18 U.S.C. § 3145(b). (Dkt. 35.) The government filed a brief in opposition to Monroe's motion on November 2, 2026. (Dkt. 39). Monroe replied to the government's brief on November 5, 2026. (Dkt. 44.)

### B. Factual History

1. <u>Monroe's Criminal History</u>

Monroe has been in and out of the criminal justice system for over twenty years. (*See generally,* Pretrial Bail Report at 3–5 (Dkt. 7); Gov't Opp. at 7 (Dkt. 39).) He was convicted of criminal possession of a loaded firearm in the third degree in a county court of New York state in 2004, for which he was sentenced to a one-year term of imprisonment. (Pretrial Bail Report at 3; Gov't Opp. at 7.) In 2005, he was charged with indecent exposure and resisting

arrest in Charlottesville General District Court. (Pretrial Bail Report at 3.) He received a 90-day sentence as to the first charge (all suspended) and the second charge was dismissed. (*Id.*)

In February and June of 2006, Monroe was arrested in Virginia on charges of the sale or distribution of marijuana, obstruction of justice, eluding police, child neglect, driving with a suspended license, reckless driving, and assault on a law enforcement or department of corrections officer. (*Id.* at 3–4; Gov't Opp. at 7–8.) He also failed to appear on a misdemeanor charge in August 2006, for which he was found guilty and paid restitution. (Pretrial Bail Report at 4.) (*Id.*) In September 2006, Monroe was charged with escaping from jail or custody by force or violence while awaiting trial. (*Id.*) Monroe also appears to have been charged with assault and battery for the same incident, as the charge was incurred on the same day as the escape charge. (*Id.*)

Sometime after he had been arrested on the Virginia charges, but before he had been sentenced, Monroe went to New York with his mother to visit her ailing father. (Hr'g Tr. 24:7–17.) While in New York, Monroe was charged with and convicted of criminal possession of a firearm that resulted in a nine-year term of incarceration. (Pretrial Bail Report at 4; Gov't Opp. at 8.)

After being released from New York state custody, Monroe returned to Virginia for sentencing before the Charlottesville Circuit Court regarding his June and September 2006 charges. (Gov't Opp. at 8.) He received a term of six months' imprisonment each for the charges for assault on a law enforcement officer and obstruction of justice, (*id.* at 3); four

days' imprisonment for eluding the police, (*id.*); and seven months for the child neglect charge, (*id.* at 4).[1] These sentences were scheduled to run consecutively to one another. (*Id.* at 3–4.) The circuit court also imposed a three-year term of probation for these convictions. (*Id.*)

In August 2019, Monroe was charged with assault of a law enforcement or department of corrections' officer, for which he received a six-month term of imprisonment and a one-year and six-month term of probation. (*Id.* at 4.) In January 2020, Monroe was charged with possession of a firearm by a nonviolent felon, for which he received a two-year term of imprisonment and a three-year term of probation. (*Id.* at 5.) On October 27, 2020, the circuit court approved Monroe for the Home Electronic Incarceration Program. (Ex. 4 to Mot. to Revoke, at 2 (Dkt. 35-4).)

Apart from charges in March 2025 regarding drug possession, strangulation, and assault and battery of a family member, for which either the disposition is unknown or the charges were dismissed, (Pretrial Bail Report at 5), Monroe appeared to stay out of trouble until 2026. In April 2026, Monroe was living with his mother. (Hr'g. Tr. at 26:5–7.) She called the police after she was unable to calm Monroe down while he was experiencing a mental health crisis. (*Id.* at 26:2–8.) During the call to police, Ms. Monroe told the dispatcher that Monroe was "known to have a gun." (Ex. 1 to Gov't Opp. at 2 (Dkt. 39-1).) She also told officers that she was concerned about his mental health episodes and his

---

[1] Monroe received a term of 90 days imprisonment with 90 days suspended for the charge regarding the sale or distribution of marijuana. (*Id.* at 3.) The charges for driving with a suspended license, driving recklessly, and escape from prison with force were all dismissed. (*Id.* at 4.)

aggressive, violent nature, which were compounded by his use of drugs, including "spice."[2] (*Id.*) Monroe was verbally aggressive at the scene, and told officers he would not go with them and that they would have to shoot him. (*Id.*) Eventually, Monroe vacated the residence. (*Id.*)

2. Events Giving Rise to Monroe's Current Federal Charges

On or about June 2, 2026, the University of Virginia Police Department ("UPD") learned that Monroe, then an employee of the University of Virginia ("UVA") Facilities Management team, had arrived to work with a firearm in his carpenter-style tool belt. (Aff. in Supp. of Criminal Compl. ¶¶ 5, 9 (Dkt. 3-1).) When another employee told Monroe that he was not allowed to have firearms on UVA grounds, Monroe replied that he had a permit and had forgotten to take the firearm out of his belt.[3] (*Id.* ¶ 9.)

UPD received state warrants to search Monroe's car and his mother's house. (*Id.* ¶ 12.) Monroe was again residing with his mother at the time, though only sporadically when he was not living with his girlfriend. (Ex. 2 to Gov't Opp. at 4–5 (Dkt 39-2).) A Virginia State Police SWAT team and the Charlottesville City Police Department executed the search warrant on his car and his mother's house on June 18, 2026, with UPD members present. (Aff. in Supp. of Criminal Compl. ¶ 13; Ex. 3 to Gov't Opp. at 2 (Dkt. 39-3).) While law enforcement was securing the residence, Monroe tried to flee but was apprehended by state

[2] Spice is a form of synthetic marijuana. (Gov't Opp. at 9 n.8 (citing *Spice/ K2, Synthetic Marijuana*, U.S. Drug Enf't Admin., https://www.dea.gov/factsheets/spice-k2-synthetic-marijuana (last visited November 13, 2026)).)

[3] "'[T]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information'" during a detention hearing. *United States v. Vane*, 117 F.4th 244, 250 (4th Cir. 2024) (quoting 18 U.S.C. § 3142(f)) (cleaned up). The court will therefore consider this out-of-court statement in making its detention determination.

police. (Ex. 3 to Gov't Opp. at 2.) Monroe was physically and verbally combative towards the arresting officers and initially resisted arrest. (*Id.*) He was also verbally aggressive towards officers while being treated for minor injuries sustained during the arrest at the UVA emergency room, telling them that he would fight them when they took his handcuffs off. (*Id.* at 3.) During the detention hearing, Monroe's counsel explained that Monroe's demeanor during and after the arrest was due in part to the fact that officers executed the search warrant early in the morning before he could take his medications, which help him manage his mental health symptoms. (Hr'g. Tr. at 33:10–16.)

When law enforcement executed the warrant on Monroe's car, they found a firearm in a black bag in the front passenger seat along with another bag which contained a small amount of green leafy substance that resembled marijuana. (Ex. 3 to Gov't Opp. at 4.) They also found a larger blue bag which contained several of Monroe's prescription medications. (Hr'g Tr. at 7:15–18.) Before executing the warrant, law enforcement had observed Monroe placing multiple bags inside his car. (Ex. 2 to Gov't Opp. at 2.)

When law enforcement searched Ms. Monroe's house, they found a firearm located in plain view in a bedroom occupied by another man who was temporarily living at the residence. (Ex. 2 to Gov't Opp. at 4; Hr'g Tr. at 28:19–24.) Ms. Monroe testified that she was unaware this man had a firearm in her home at the time. (Hr'g Tr. at 29:17–19.)

Law enforcement also spoke with Ms. Monroe while executing the warrants. She advised that rather than taking his prescriptions to manage his mental health symptoms, Monroe self-medicates with spice and PCP (*i.e.*, phencyclidine). (Ex. 2 to Gov't Opp. at 4–

5.) She also told them that Monroe carried a firearm because he thinks people are trying to kill him.[4] (Hr'g Tr. at 11:19–20.)

Monroe received two state charges arising from this incident: 1) possession of a firearm by a nonviolent felon within ten years of having previously been convicted of a felony, and 2) obstructing or resisting a law enforcement officer without force. (Pretrial Bail Report at 5.) Monroe was released on bond and remained in the community without incident until federal law enforcement filed a complaint charging him with the same conduct underlying the state charges. (*See* Compl. (Dkt. 3); Mot. at 1–2. (Dkt. 35); Hr'g Tr. at 14:4–7.) The state felon-in-possession charge were dismissed on September 17, 2026. (Pretrial Bail Report at 5.)

3. <u>Monroe's History of Mental Health Struggles</u>

Monroe has long struggled with his mental health. (Mot. at 5.) He has been diagnosed with schizophrenia, depression, and post-traumatic stress disorder ("PTSD"). (*Id.*; Hr'g Tr. at 19:7–20:2.) Ms. Monroe testified that when her son fails to take his medications, he can become agitated and angry but is not a danger to others. (Hr'g Tr. at 26:2–25.) She also stated that he sometimes self-medicates with drugs rather than taking his prescriptions. (Ex. 1 to Gov't Opp. at 2.)

Monroe began participating in the Offender Aid and Restoration program in the Therapeutic Docket in December 2025. (Ex. 1 to Mot. at 1.) The Therapeutic Docket is a local post-plea program that facilitates treatment and case-management services for

[4] Ms. Monroe testified that, to her knowledge, nobody was trying to kill her son. (Hr'g Tr. at 25:20–23.)

defendants who have been diagnosed with serious mental illnesses. (*Id.*) It partners with the Region Ten Community Services Board to provide these services, and Monroe received individual therapy through Region Ten. (*See* Hr'g Tr. at 13:10–14; Ex. 1 to Mot. at 1.) Over time, Monroe made "significant improvements in attendance, engagement, mental health, and overall compliance." (Ex. 1 to Mot. at 1.) He was also able to consistently maintain full-time employment between starting this program and his arrest in June. (*Id.*) Following his termination from employment with UVA, he promptly secured other employment. (*Id.* at 2.) He expressed regret about his actions to his case worker, joined two new group therapy programs, and began seeing a new individual therapist. (*Id.*) As of his federal arrest, Monroe had advanced to step three this program and was on track to graduate in May 2027. (*Id.*)

One condition of Monroe's participation in the Therapeutic Docket is that he stays off drugs. (Hr'g Tr. at 20:10–12.) His mother testified that he has been getting drug screens through the Therapeutic Docket and Region Ten since he was released on bond in June of this year. (*Id.* at 22:22–23:2.) His counsel noted that he had received one or two positive screens for marijuana after June, but that he had otherwise stayed clean. (*See id.* at 39:11–15.) However, Ms. Monroe told law enforcement during the April 2026 incident that because Monroe smokes spice, his drug tests from drug court and the Therapeutic Docket come back clean even if he is actively engaging in drug use. (*See* Ex. 1 to Gov't Opp. at 2.)

Monroe also received strong support from his community following his federal arrest. The court received six letters attesting to Monroe's character and the positive impacts he has had on those around him despite his struggles with mental illness. (*See generally* Ex. 5

to Mot. (a letter from Monroe's pastor to the court) (Dkt. 35-5); Ex. 1 to Reply Br. (compiling other letters) (Dkt. 44-1).) Monroe's pastor wrote about Monroe's service within his church community, his "deep sense of responsibility," and "his sincere desire to transform his life" despite his trauma and past mistakes. (Ex. 5 to Mot.) An employee of a local offender reentry program wrote that Monroe has demonstrated a willingness to "establish a productive life, "contribute to society," and "establish structure, independence, and stability." (Ex. 1 to Reply Br. at 1.) The employee also wrote that Monroe could receive support from this program if he were released. (*Id.* at 2.) Monroe's case manager on the Therapeutic Docket wrote that his "natural inclination" is to help others around him, that he "has consistently demonstrated a strong work ethic and determination to improve his life," and that he "demonstrates a deep sense of empathy toward his peers" despite his history of trauma. (*Id.* at 1.) Monroe also actively sought to contribute to his community by volunteering at the Salvation Army prior to his federal arrest. (Hr'g Tr. at 21:10–16.)

## II. Standard of Review

When a magistrate judge orders the pretrial detention of a criminal defendant, the defendant may move for revocation of the order. *See* 18 U.S.C. § 3145(b). The district court conducts a *de novo* review of the magistrate judge's detention order. *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989). The court "must make an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001).

Pursuant to the Bail Reform Act of 1984, a court shall order an individual charged with a federal offense detained pending trial if it finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). This conclusion must be supported by clear and convincing evidence. *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (citing 18 U.S.C. § 3142(f)(2)). To justify pretrial detention, the government has the burden of establishing that either: (1) "no conditions other than detention will reasonably assure the safety of any other person and the community," *id.*; *or* (2) "no combination of conditions will reasonably assure the defendant's presence at future court proceedings," *Stewart*, 19 F. App'x at 48. The government only needs to prove one of these two prongs, not both. *See id.* If neither prong is met, the court must release the defendant "subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

The court's determination is governed by four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (A) The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community,

> > community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). The court will consider each factor in turn.

## III. Analysis

Monroe asks the court to reconsider the Magistrate Judge's detention order and remand him to the custody of his mother as a third-party custodian. (*See* Mot. at 12–13.) He proposes several conditions for his release, including supervision by the United States Probation Office, random drug screening, and continued participation in the Therapeutic Docket and treatment, including medication compliance, with Region Ten. (*Id.* at 13.) He also proposes that he be placed on home detention and not be permitted to leave except for employment; lawyer, medical, and mental health appointments; and other court obligations. (*Id.*) Monroe challenges the need for pretrial detention, arguing that he has maintained good behavior while on bond from his most recent state charges. (*See* Mot. at 13.) He also points out that if he were truly a danger to the community, the government would not have waited nearly four months to arrest him on federal charges while he was at liberty pending the resolution of his state charges. (*See* Mot. at 4.) In addition, Monroe points to his efforts to continue mental health treatment and seek employment between his state arrest in June and

his federal arrest in October as evidence that he will not pose a danger to the community if he were released. (*See* Mot. at 5.) He also argues that his mother would be a suitable third-party custodian because she has proven herself willing and capable of seeking outside aid when she cannot manage his mental health symptoms alone. (Mot. at 8 (discussing Ms. Monroe's April 2026 call to the police).)

The government points to Monroe's lengthy criminal history, including previous firearms convictions, as demonstrating his continued willingness and ability to possess firearms despite his status as a felon. (Gov't Opp. at 7–8). Though the government lauds Monroe's efforts to seek mental health treatment and engage with his community, it argues that four months of good behavior pales in comparison to this 23-year long history. (*Id.* at 10.) It also argues that his serious mental health conditions, which it contends are unreliably managed and aggravated by his substance abuse, further put him at risk for endangering those around him. (*Id.* at 9).

1. Nature and Circumstances of Offense Charged

Several courts have recognized, in the Bail Reform Act context, that possession of a firearm by a convicted felon is a serious offense that poses a substantial risk of harm to others. *See, e.g.*, *United States v. Riley*, 635 F. Supp. 3d 411, 417 (E.D. Va. 2022); *United States v. Chappelle*, 51 F. Supp. 2d 703, 704 (E.D. Va. 1999); *United States v. Aiken*, 775 F. Supp. 855, 857 (D. Md. 1991) (finding that possession of a firearm by a felon "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of the possession" (internal quotations omitted)); *United States v. Geter*, No. 7:18-

cr-00034, 2018 WL 10561517, at *1–*2 (D.S.C. Sept. 24, 2018); *United States v. Boykins*, 316 F. Supp. 3d 434, 437 (D.D.C. 2018); *United States v. Sanders*, 466 F. Supp. 3d 779, 784 (E.D. Mich. 2020).

Monroe argues that because there was nothing "aggravated" about the allegations against him, this prong of the analysis should weigh against pretrial detention. (*See* Mot. at 8–9 (referencing the Magistrate Judge's finding at Hr'g Tr. at 48:15–17).) Even if the mere fact of possession in this case was of a nonviolent nature, "carrying a loaded firearm—especially if the carrier has a violent history . . . —has the great potential to escalate into violence," and this potential is "only heighten[ed]" by drug use. *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020); *see also Riley*, 635 F. Supp. 3d at 414, 417 (finding that the nature and circumstances of the firearm possession at issue weighed against release, even when allegations that the defendant had merely left a closed bag containing a firearm at his place of work "appear[ed] nonviolent"). Monroe has previously incurred several assault and firearms-related charges and has resorted to drug use instead of taking his prescribed medications to manage his mental illness. (*See* Pretrial Bail Report at 3–5; Ex. 2 to Gov't Opp. at 4–5.) Still more concerning is the fact that Monroe brought his firearm to a university where he likely worked near students and other UVA employees as a landscaper. (*See* Ex. 1 to Mot. at 1–2.) Thankfully, nobody was harmed by Monroe's possession of a firearm on campus during his employment with UVA. Nevertheless, his actions created a substantial risk of harm for those around him. The nature of the allegations weighs against Monroe's case for release from detention.

2. Weight of Evidence Against Monroe

As the Magistrate Judge correctly noted, the weight of the evidence against Monroe is strong and weighs against release. (Hr'g Tr. at 48:13–15.) Monroe did not deny that he possessed a firearm on UVA's campus when questioned by his former coworkers. (Aff. in Supp. of Criminal Compl. ¶ 9.) Before law enforcement executed the state search warrants on June 18, 2026, they observed Monroe placing a bag that was later found to contain the gun in the passenger seat of his car. (*Id.* ¶¶ 13–15.) They attested that no other person accessed Monroe's car between the time when he placed the bags in the front seat and when law enforcement searched the vehicle. (*Id.* ¶ 16.) Monroe has not contested or rebutted these facts.

3. History and Characteristics

It is true that much of Monroe's criminal history took place two decades ago. (*See* Mot. at 9.) Still, this history demonstrates that Monroe has a long background of noncompliance with and resisting law enforcement, (*see, e.g.*, Pretrial Bail Report at 3–4 (recording Monroe's convictions for eluding police and assault on law enforcement personnel)); assault, (*see id.* at 4 (recording Monroe's 2006 arrest and 2016 conviction for assault and battery)); and the unlawful possession of firearms, (*see id.* at 3–5 (detailing Monroe's 2004, 2009, and 2021 firearms convictions)).[5] The two most recent of Monroe's three prior firearms convictions were charged while he was on pretrial release or probation.

[5] The court notes that Monroe did not have the opportunity to add to this criminal history from 2007 to 2016 because he was incarcerated (for a firearms charge, no less). (*See id.* at 4 (recording Monroe's 2007 arrest and 2009 conviction in New York for the criminal possession of a firearm).)

(*Id.* at 3–5; Detention Order at 1–2 (Dkt. 16).) Monroe's demonstrated pattern of possessing firearms while on state supervision or release weighs against pretrial release in this case, especially given the nature of the federal charges now pending against him. *See Riley*, 635 F. Supp. 3d at 418 (taking note of the defendant's pattern of violating supervised release terms in finding that the third prong of this analysis weighed against pretrial release); *Geter*, 2018 WL 10561517, at *2 (finding that the defendant's possession of a firearm during a period of supervised release weighed against release); *United States v. Hopkins*, No. 20-cr-00237, 2021 WL 1164230, at *5 (D. Md. Mar. 26, 2021) (same).

The court recognizes that Monroe's previous run-ins with the law may have been caused in part or exacerbated by his untreated mental illness. (*See* Mot. at 9–10.) The court also acknowledges Monroe's admirable efforts in not only seeking treatment and support for his mental health issues, but in actively persisting in these efforts even after his arrest in June. (*See, e.g.*, Ex. 1 to Mot.) However, though it seems that Monroe's mental health symptoms are well-managed when he takes his medications, his mother has told law enforcement that he often chooses instead to self-medicate with drugs. (Ex. 1 to Gov't Opp. at 5.) Monroe appears to become agitated, aggressive, and unmanageable when not properly medicated. (*See* Exs. 1–3 to Gov't Opp. (detailing Monroe's behavior during the April 2026 incident and the June 18, 2026 arrest, both times when he was unmedicated).) The court does not believe Monroe's mental illness alone makes him dangerous to others in the community. Rather it is his propensity to obtain and carry firearms, because he believes

people are trying to kill him, that creates a risk of danger this court cannot ignore. (*See id.* at 25:20–23.)

Additionally, ordering random drug screenings while on release would not prevent him from using drugs to self-medicate. Monroe's mother has advised that his drug screens come back negative, even when he is actively using drugs, because he uses synthetic marijuana. (*See* Ex. 1 to Gov't Opp. at 2.) And there is no guarantee Ms. Monroe could ensure that her son takes his medications as prescribed. In April 2026, she had to call the police during one of her son's unmedicated episodes even though he was living with her at the time—under nearly the same conditions that would exist if this court released him to her custody now. (*See id.*)

Again, though the court appreciates the great amount of effort that Monroe has exerted to get his life on track, many of the incidents that concern the court (including his mother's April call to police and the fact that he brought a gun onto a university campus in June) took place while he was participating in the Therapeutic Docket and receiving mental health treatment. (*See* Ex. 1 to Mot. at 1 (noting that Monroe had participated in the docket from December 2025 until his federal arrest).) This factor weighs against release.

4. Danger to the Community

Monroe argues that his mother would be a suitable third-party custodian if he were released pending trial. (*See* Mot. and 8.) However, as discussed above, Monroe has refused to take his prescribed medications and has instead resorted to drug use while living in her home. (*See* Ex. 1 to Gov't Opp. at 2; Ex. 3 to Gov't Opp. at 4.) Ms. Monroe was also

unaware that another man staying in her home was in possession of a loaded firearm in June 2026. (Hr'g Tr. at 29:17–19.) Though Ms. Monroe clearly wants the best for her son and expressed her willingness to enforce conditions of his release, (*see id.* at 18:8–19:6; 30:19–31:1), the court is not convinced that releasing Monroe to her custody would ensure his or others' safety.

Moreover, Monroe's "propensity to possess firearms when he is not authorized to do so," and the fact that "prior periods of incarceration and court supervision have [not] deterred [him]" from unlawfully possessing firearms, suggest that he would pose a serious danger to the community if he were released. *See Hopkins*, 2021 WL 1164230, at *5. Ms. Monroe's testimony that Monroe was arming himself because he believes people are trying to kill him, (*see* Hr'g Tr. at 25:20–23), only heightens the court's concern that he will again seek out firearms if he were released pending trial and he did not take care of his mental health. Based on the evidence before it, the court is not convinced that there exists a combination of conditions that would ensure he sticks to his medication regimen and refrains from possessing firearms, which are the two main factors driving the court's concern regarding the safety of others and the community. Of the six conditions Monroe proposes for his release, (*see* Mot. at 13,) four of them have already proven ineffective in regulating his behavior and unlawful possession of firearms. Monroe was already receiving medication, mental health treatment, and drug testing, and living with his mother, when he experienced mental health crises and possessed firearms in April and June 2026. (*See* Ex. 1 to Mot.; Ex. 1 to Gov't Opp. at 2; Ex. 2 to Gov't Opp. at 4–5.)

* * *

Overall, based on the factors set forth in 18 U.S.C. § 3142(g) and a careful review of the record, the court concludes that the government has met its burden of showing, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community if Monroe were released pending trial. 18 U.S.C. § 3142(c)(1)(B). Monroe's efforts to pursue mental health treatment, though very commendable, do not outweigh the seriousness of the crime with which he is currently charged, the substantial risks it imposes on the community, his lengthy criminal history, his pattern of unlawfully possessing firearms while on parole or pretrial release, the weight of evidence against him in this case, and the reality that concerning incidents, including the facts giving rise to his federal charges, took place while he was engaged in treatment. All four § 3142(g) factors weigh against pretrial release.

## IV. Conclusion

For these reasons, the court finds that the government has met its burden by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any person and the community if Monroe were released before trial. Accordingly, Defendant's Motion to Revoke Detention Order, (Dkt. 35), is **DENIED**.

An appropriate Order will issue.

**ENTERED** this 13th day of November, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE